Curia, per Johnson, Ch.
The decree of the circuit court, proceeds on the concession, that the settlement of 1824, standing alone, was void as to creditors, in consequence of the indebtedness of James D. Mitchell at the time, and that the marriage articles of 1809, are also void as to creditors, because they were not recorded within the time prescribed by the act of the Legislature, and the defence rests upon the naked ground, that the articles of 1809 were, notwithstanding, a valid consideration for the settlement of 1824. The act of 1785, (2 Brev. Dig. 45,) provides that “ all and every marriage contract, deed, or settlement,” if not recorded within the time and in the manner therein prescribed, should in respect to creditors, “be deemed, and is hereby declared to be fraudulent; and all and every part of the estate intended to be thereby secured to such person or persons, shall be subject and liable to the payment and satisfaction of the debts due and owing by such person or persons, in as full and ample a manner, to all intents and purposes whatsoever, as if no such deed, contract, or settlement, had ever been made or executed.”
Now let it be conceded, (and there is no question about its correctness,) that the articles of 1809, were valid between the parties, and that as between themselves they would constitute a sufficient consideration for the settlement of 1824. But what did the legislature intend by declaring, that they should be deemed fraudulent for want of recording, and that the property intended to be secured should be liable to debts in the same manner and to the same extent, as if they had never been made or entered into? Was it that the husband and wife should, by secret articles entered into before marriage, secure their estates, one or both, to the separate use of the wife and her issue, and hold out the husband to the world as the ostensible owner, that he might take his chance to improve his fortune, and when overwhelmed with ruin, to hold up the articles as a sufficient consideration for any settlement he might make ? Such seems to me inevitably the tendency of the doctrines relied on in support of the decree, but for myself I am *402 constrained to conclude, that however valid they may be between the parties, the opposite conclusion was intended, and is clearly expressed in the act, that as to creditors, the unrecorded articles are of no more avail than if they had never existed, or had been “ blotted out forever.” If, as I conclude, the articles were valid between the parties, although not recorded within the time, then it follows that they were a sufficient consideration, as between themselves to support the subsequent settlement. — And if it had been entered into at a time when James D. Mitchell was unencumbered with debt, and had been duly recorded, there can hardly be a question that they would have been valid against subsequent creditors. But a settlement confessedly void as to creditors, can never be supported on a consideration equally void, as to them. In contemplation of the act, it is as though it never had existed.
The case of Stiles and the Attorney General, 2 Atk. 152, has been referred to in support of the decree, and I think it establishes that a voluntary bond, although void, is a sufficient consideration to support a subsequent bond for the amount due thereon ; but there were other circumstances in that case, on which I think the case turned. In that case, the Duke of Wharton had undertaken by bond, to pay an annuity to Dr. Young, for life, of £100, without any legal consideration; and subsequently by indenture, in which it was recited that he was in arrears, on account of this annuity, in the sum of £350, and that Dr. Young had quitted the service of the Earl of Exeter’s family, in whose employment he was, at the special instance of the Duke, by which he had lost an annuity of £100, he granted to Dr. Young an annuity of £100 for life, to be paid quarterly, in lieu of the said £350, and charged the same on his estate. Dr. Young, on his examination before the Master, stated that on the pressing solicitations of the Duke, and his assurances that he would provide for him more amply, he quitted the service of the Exeter family, and refused an annuity of £100, which had been offered him for life, provided he would continue tutor to Lord Burleigh; and the Lord Chancellor Hardwicke directed the annuity to be paid out of the sales of the estates, in opposition to the Duke’s bond creditors. Now in the loss which Dr. Young sustained by leaving the Exeter family and accepting the *403 offer of the Duke, we have full, ample and valuable consideration for the second annuity, without resorting to the previous bond as a consideration to sustain it; there was no necessity for it, and it will be difficult to collect from the case itself, that it entered into the judgment of the court. So far as concerns creditors, to set up the naked bond as a consideration of the second annuity, would be in my judgment utterly irreconcilable with Lord Eldon’s judgment in Bury exparte, 19 Ves. 219. There, a voluntary bond, given by a bankrupt before the act of bankruptcy, was given up, and in consideration thereof, a new bond was substituted for the amount, and his Lordship remarks, that “the first bond was clearly good as between the parties, and had payment been enforced by process of law upon that security, it is very difficult to maintain that the money paid could have been recovered. The obligor, instead of payment, gives another bond, which was not voluntary, being given on cancelling the former security. If the transaction was tainted with mala fides — if the design was to substitute a bond upon consideration, in room of a voluntary bond, it would be effectual,” &c. But in the conclusion it was said, that there was an affidavit of the bankrupt’s insolvency, when he gave the second bond, and the Lord Chancellor said, “ if that could not be contradicted, he could do nothing.” It would seem, therefore, that the fact that the bankrupt was insolvent (for he had not committed an act of bankruptcy,) at the time the second bond was given, was regarded as sufficient evidence of mala fides to postpone it to other creditors. The obligor was bound by the first bond, to the whole extent that he would be by the second, and no other motive could have led to the execution of the second bond, but to substitute one which was valid, for that which was void as to creditors. In the language of Lord Eldon, “ that will not do.” Nor is there in Stiles and the Attorney General, any thing inconsistent with this conclusion. Direct proof of fraud is very rarely attainable — parties intending to perpetrate a fraud, never permit others to participate in the confidence, when it can be avoided; hence the necessity of inferring it from the attending circumstances. How, (let it be asked,) could it be expected that the creditors of the bankrupt, could prove that he had the secret intent to put his sister upon a *404 footing of equality with his other creditors, by means of the second bond ? And on the other hand, would his most positive declarations that such was not his intention, satisfy one who reasoned about it ? The naked circumstance that the bond could have no other effect, furnishes the answer.
In the case cited, the first bond was good, between the parties and void as to creditors, for want of consideration. In the case at bar, the articles of 1809, were good between the parties, but void as to creditors, for want of recording. In that case, the court refused to set up the second bond, because the obligor was insolvent at the time ofits execution. In this, when James D. Mitchell executed the settlement in 1824, he was largely indebted to the complainants. He became, also, largely- indebted to other banks and individuals, and in the end surrendered all his estate not included in the settlement, which proved insufficient for the payment of his debts. In what do these cases differ.
• I have felt the full force of the argument in support of the decree founded on the nature of the consideration of the articles of 1809, and the settlement of 1824. There was not only the marriage, but the fortune of the wife. I have felt, therefore, the strongest inclination to support the settlement, if I could do so consistently with the law; but after the best consideration I have been able to give the subject, I am persuaded that it can not be supported on principle. I think I have before shown, that to do so would be in effect to write “repealed,” on the act requiring those contracts to be recorded. The motives leading to the execution of the settlement, however meritorious in themselves, furnish perhaps the most powerful inducement to give the claims under it, the precedence of other demands, and admits of no other proof than that which arises out of the circumstances. An attempt has been made to sustain the settlement, to the extent of Mrs. Mitchell’s interest in the proceeds of the sales of the real estate, to which she was entitled on the death of her mother Mrs. Waring, on the ground that her parting with her inheritance in that, constituted a new consideration for the settlement — from the facts stated in the circuit decree, it appears that' this estate had been, sold for partition, I suppose, under an order of the court, and had thus been converted *405 into.money, which was paid over to the defendant Mitchell, by Wm. S. Smith. It had ceased to be realty, and the marital rights of the husband attached upon it as effectually as it would have done on any other chattel interest. I have looked through the circuit court decree, and the examination of Wm. S. Smith, taken before the Master, in the hope of finding something that would show, that the settlement was made on condition of his paying over the money to Mitchell; but on the contrary, Smith says that he does not “recollect that any thing was said about the settlement when the money was paid.” “ That after Mitchell received the share, he asked witness whether it would not be proper to make a settlement of it, and witness said it would be proper, as a compliance with the original settlement,” and he then made the settlement. There is, therefore, no support for this ground.
In other respects, I concur in the decree of the circuit court. It is therefore ordered and decreed, that so much of the decree of the circuit court, as dismisses the bill against the defendants James D. Mitchell and wife, and Wm. S. Smith, be reversed, and that the settlement of 1st March, 1824, in the pleadings mentioned, be and the same is hereby declared null and void, as against the complainants.
Johnston, Ch., Gantt, Evans, Butler, O’Neall and Eahle, Justices, concurred.
Harper, Ch.
I have not been able to see sufficient reason to change the opinion which I have expressed in this case. I would repeat that the question, and only question, is, whether the settlement of 1824 was fraudulent ? That was recorded in due time. There are various means by which fraud may be shown. In general, when fraud is spoken of with reference to creditors, it means some dishonest and unjustifiable contrivance to defeat creditors. Though a deed may be founded on full consideration, yet, if it were merely a contrivance to enable the grantor to defeat his creditors, by turning his property into money and escaping with it, this would be fraudulent, as in the case of Lowry v. Pinson, 2 Bail. 324, or in Twyne’s case. ' If a conveyance were made by *406 a person greatly indebted to one of his family, on very inadequate consideration, this might be enough to satisfy the court of his fraudulent intention. There are a thousand dishonest schemes by which creditors might be defeated, but for the interference of the court. In all these cases however, the corrupt intention and dishonest device, must be established by proof. The court passing upon the transaction, must be satisfied that there existed what is called actual fraud.
If the conveyance be voluntary, however, and the grantor be indebted at the time, then without any express proof of fraudulent intention, or though the court may be perfectly satisfied that, in point of fact, there was no such fraudulent intention, yet by an artificial construction, the instrument is inferred to be fraudulent; such was the case of Izard v. Izard, Bail. Ch. R. (in press.) For this there are sufficient reasons. It would be difficult or impracticable to fix the degree of indebtedness, which should evidence the actual fraudulent intention, when a person makes a voluntary conveyance. Men are apt to be sanguine in their calculations; and a person even much indebted, making a gift, may still believe, in good faith, that he will be able still to pay his debts. A man is bound to be just before he is generous. According to the policy of the law, if some must suffer, it is proper that it should be those, even wife or children, whose claims on him are ex debito natures, rather than creditors whose claims are ex débito justitice. It can hardly be said that they suffer wrong in being deprived of that which they would not have had if their grantor had done justice to creditors, who may have trusted him on the faith of the property in his possession. But if there is any consideration, however inadequate, then the question is of bonafides or actual fraudulent intention. Union Bank v. Toomer, 2 Hill. Ch. 27.
It is no evidence of fraudulent intention, that a debtor should convey to one creditor in satisfaction of his debt, though both may know'that the effect of it will be to defeat other creditors. If authority were wanting for this, the subject is very fully considered in Niolon v. Douglass, 2 Hill. Ch. 443.
Then supposing this settlement to have been founded on a consideration: what is the evidence of actual fraudulent intention? *407 The circumstances show conclusively the impossibility of any such intention. The articles of 1809, were not recorded within the time limited by the statute, and according to the strict letter of the law were void. They were recorded, however, within ten days afterwards. The defendant Mitchell, did every thing that was in his power to give notice to all'the world, of the claim which his wife had upon him. All of his debts, so far as appears, were contracted long subsequently to this period. .Creditors have lost no advantage which they could by possibility have had, if the articles had been recorded in due time. The property which was the consideration of the settlement of 1824, (not denied to be an adequate one,) had never been in the defendant Mitchell’s possession, and it is not to be supposed ’that creditors trusted him on the faith of it — unless, indeed, we suppose them to have found the articles on record, and thus to have ascertained his rights in it. But actual notice, as we have repeatedly decided, supplies the want of recording. It would be fraud in creditors to take advantage of the want of recording in due time, when they have had all the information which recording was intended to supply, and trusted the debtor with their eyes open. How idle would it then be to say, that finding the articles recorded after the proper time, creditors might be led to suppose the wife’s claim under them abandoned. The feme covert could not abandon them, and creditors must have known that the trustee could not abandon them without a gross violation of duty.
Then can the settlement of 1824, be regarded as voluntary? — . I confess that I hardly know how to argue this question. In addition to what I have said in the circuit decree, it seems to me, that the case exparte Bury, 19 Ves. 218, decided by Lord Eldon, is in point. In that case the bankrupt, had given a voluntary bond, and afterwards gave another bond in lieu of it and took it up, According io the rule of equity, a voluntary bond is void as to creditors, and will be postponed even to simple contract creditors.— Lechmere v. Earl of Carlyle, 3 P. W. 222; Lady Cox’s case, ib. 339; James v. Powell, 1 Eq. Ca. Ab. 84. The question in the case was, whether the second bond should have priority over simple contract creditors. Lord Eldon thought it might, inasmuch as *408 the first bond might have been enforced at law against the obligor himself, provided that upon strict scrutiny it appeared that the second bond was not tainted with any degree of mala fides, as intending to substitute a valid security in place of one which could not have been enforced as against creditors. Accordingly, when it appeared that the second bond was given after the obligor had become insolvent, Lord Eldon said he could do nothing. Now, what was decided in that cáse ? Why that the first bond, though voluntary and void as to creditors, formed a valuable consideration for the second; but that the second bond was itself tainted with mala,fides, as intending to substitute a valid security in place of one that could not have been enforced against creditors ; and he decided against the second bond, not as being voluntary, but as being itself infected with actual fraud. But W’hat is that case, compared to the present. There the obligee was in truth and in fact, a mere beneficiary. She had paid no value — it could not be said that she suffered wrong, in being disappointed in a bounty which the obligor could not extend to her, consistently with justice to his creditors; there was no office for the registration of bonds, from which the creditors could obtain notice, and they must have been supposed to trust him on the faith of the property in his possession. Here, in addition to the marriage consideration, the defendant Mrs. Mitchell, has paid her money to the full value, so far as appears, of the benefit secured to her; the creditors have, in substance and effect, had all the notice which the law intended them to have, and they could hardly have trusted their debtor on the faith of property not in his possession.
This may serve to obviate the difficulties which are apprehended in relation to rendering nugatory the law for the registration of marriage contracts. If as suggested in argument, a man after marriage should make a voluntary agreement for a'settlement on his family, and keeping this private, should afterwards become indebted, and then should make the settlement, intending to substitute a valid security for one that was void as to creditors, this would make a case of actual fraud. In the present case, even if the articles had not been recorded at all, it would be 'difficult to say, that upon a fund of his wife’s, to which creditors could not *409 have trusted, coming into his hands, the'husband was guilty of actual fraud in .making a settlement equivalent to it. It was no more than justice required of him. But as it is, the argument amounts to this, that an instrument, with respect to which the possibility of actual fraud is conclusively disproved, and which every consideration of justice, honour and conscience, required the grantor to make, must nevertheless be regarded as fraudulent, on account of its being voluntary, when it is plainly not voluntary, in any sense that it is possible to attribute to the term. I cannot but think the claim of the creditors utterly unconscientious.
Bailey & Dawson, for the motion.
Petigru; Mazyck, Perroneau & Finley, and Bentham & Holmes, contra.
Richardson, J., concurred with Harper, Ch.